## MISSOURI PAC. R. CO. v. SIRATT.
### No. 10153.

Circuit Court of Appeals, Eighth Circuit.
July 2, 1935.

E. W. Moorhead, of Little Rock, Ark. (R. E. Wiley, of Little Rock, Ark., on the brief), for appellant.

William F. Denman, of Prescott, Ark. (Tom J. Terral, of Little Rock, Ark., on the brief), for appellee.

Before STONE, WOODROUGH, and BOOTH, Circuit Judges.

STONE, Circuit Judge.

This is an appeal from a judgment awarding damages for personal injuries.

There are various assignments of errors, but only two are briefed, so the others must be regarded as waived. Of these two, one is that the verdict is excessive. That matter is not subject to examination here. The other is that the dangerous condition which caused this injury was a risk which was assumed by appellee.

This issue has to do with the condition of a pit wherein the accident occurred.

Descriptions of the pit and of how the accident happened are as follows: At Little Rock, Ark., appellant maintains a considerable plant, including a machine shop, pipe shop, boiler shop, car shop, coach shop, paint shop, and blacksmith shop. The blacksmith shop is a large building containing many forges and large steam hammers. Crude oil was used in the forges. This oil was stored in large tanks. To fit this oil for use in the forges it was necessary to heat it. For that purpose it was passed through pipes in a pit and pumped by four pumps, at the bottom of the pit, into auxiliary tanks in the blacksmith shop. This pit was adjacent to the shop. For the most part it was underground, projecting above the surface about 3 feet. It was made of concrete, and was about 30 or 40 feet long, 16 feet wide, and about 14 feet deep. The entrance was through a covered manhole in the roof, which hole was about 3 to 3½ feet across. Inside the pit were the oil pumps at the bottom and a number of pipes used for different purposes. These pipes were on the walls at various heights; some being attached to the wall by strap brackets and some not. From a short distance below the manhole a ladder extended to the bottom. This ladder was of five-eighth inch steel rods bent out to form steps and with the ends sunk into the concrete wall. Some (if not all) of the pipes extended along the wall back of the ladder. The pit contained electric lights which could be turned on from above.

Appellee had been with the company at this plant some years. He was a machinist, whose duty was to look after the machinery in the blacksmith shop. Apparently the machinery in the pit was regarded as part of that having to do with the shop since he had been into the pit on various occasions in connection with repairs to the pumps. He had nothing to do with the pipes in the pit. He went into the pit when the pumps needed repair.[1] He could not remember when he had last been in the pit before the accident but thought "it hadn't been over a week

---

[1] "Q. And they had four feed pumps down in this pit? A. Yes, sir.

"Q. It was your duty to take care of those? A. Take care of those.

"Q. How often would you have to go down there to work on those? A. Some-

times I would go once every two or three weeks, just whenever they got out of shape and was reported to John Ray, I went down there. If it was twice a day I went and if it was once a month I went.

"Q. Well, on an average how often did

or ten days, maybe not that long." He knew about the pipes on the wall between the ladder steps, but they were against the wall and could not be stepped on by one using the ladder.

Early on February 18, 1931, when he went to work, he was told by his foreman that something was the matter with the pumps and to fix them. He turned on the pit lights, removed the manhole cover, and proceeded down the ladder. When he placed his foot on a certain step (as to which one there is an immaterial difference), his foot encountered an end of one of the pipes which had become disconnected and had fallen on the step tread. The pipe or his foot slipped and he was thrown to the bottom, rendered unconscious, and seriously injured.

The position of appellant as to assumption of risk is stated in its brief as follows: "Siratt himself knew better than the company if these pipes were insecurely fastened and liable to come loose and fall onto the grabiron steps, as he had been going up and down these steps and seeing these pipes every few days for seven or eight or nine years. It certainly cannot be said that he did not assume the liability of them coming loose because they were insecurely fastened; neither can it be said that he did not assume the liability of stepping on the pipe which was so large and easy to be seen, and which he did see, after it fell upon the step. The company was depending upon Mr. Siratt more than anyone else to take care of just such conditions, because he was the repair man and sent into the pit for the purpose of repairing the machinery and conditions in there. Even though he contends that he was not a pipe man the company had a right to rely upon the employees who daily went in and out of this pit to see that there was no dangerous condition existing there which they could easily remedy

or have remedied by the proper parties. There was nothing hidden about the pipe, whether it was fastened on the wall or on the step, and even if it was on the step it would support the weight of a man even though he was large like Mr. Siratt. According to the testimony of Mr. Siratt it was the fact that the pipe slipped off of the step that caused him to fall; that could not have been caused by anything else except the manner in which he put his foot upon the pipe and he could easily see the position of the pipe and could have avoided that had he looked. The wall, the grabiron steps and the pipes were all solid, substantial and strong enough to support Mr. Siratt as long as the pipe and his weight remained upon the grabiron step and he certainly assumed the condition that existed there when he put his foot on the pipe and thereby caused it to slip off of the step and let his weight go down with the pipe and turn loose of the grabirons above where he was holding with his hands. According to his own testimony he caused his own injury in the way he hit the pipe with his foot. 'This step seemed to be a little closer than the others, and as my foot hit it it seemed like it hit it quicker, you know, quicker than it should'. We submit that this was a very obvious condition which he could easily have seen and did see and he assumed the risk under the rule of law as to assumed risk under similar conditions which the courts have repeated time and again in the numerous cases we have cited."

The gist of this contention is that appellee (1) assumed the risk of the pipe becoming loose because he knew of its insecure fastening and (2) assumed the risk of injury from its being on the step because it was easy to be seen there on the step and (3) because he did see it there.

Many cases have been cited in the briefs, and they have been examined. However, it is not necessary to discuss

---

you go down there? A. Well, I couldn't say on average, I couldn't say.

"Q. Had that been the nature of your work there under John Ray for a number of years? A. Yes, sir.

"Q. How many years? A. Probably eight or nine years.

"Q. And you would go down there sometime two or three times a week; sometimes two or three times a month? A. I can't say two or three times a week. Just went down there when they needed

repairing. I guess I have been there as high as two or three times a day; probably would go for a month or two that I didn't go down there at all. Whenever it got out of shape they reported to me and I went down there and fixed them. Sometimes I would go down and work on it and have to bring it out, get parts, have to go back down and put the parts on it or in it. I don't know how often I would have to go down there."

256

them, since there is no disagreement concerning rules of law. The controversy is solely over the applicability of those rules to the facts presented by the evidence. The rules relied on by appellant are as follows: (1) That where a permanent condition, which is known to the employee and which he knows may cause injury to him, exists, he assumes the risk of injury therefrom—this rule is urged in connection with the claimed probability that the pipes back of the ladder might become loose from the wall and unjointed and then fall on the ladder steps; (2) that, where a dangerous condition is easily observable by the employee in the reasonable exercise of his senses for his own safety, he assumes the risk therefrom—this rule is urged in connection with the claim that appellee could easily have seen this projecting pipe end on the step tread had he looked; (3) that, where an employee actually sees a condition and knows the danger therefrom, he assumes the risk of injury—this is urged in connection with the claim that appellee saw the pipe end on the step tread.

As to the first, there is no evidence that appellee knew the pipes were so insecurely fastened that they might come loose and fall on the step, much less that they might (on coming loose) become unjointed and a portion thereof fall upon the ladder steps.

■ *As to an Obvious Condition.*—The steps were in the pit. Electric lighting was in the pit and appellee turned this on before descending. While it is not entirely clear, yet it seems reasonable to suppose appellee could have seen the pipe end on the step had he carefully looked to see if the steps were entirely clear. However, there seems no reason why he should have made any such careful inspection. He was familiar with the ladder, and no

reason is shown for any caution on his part as to its condition. It certainly cannot be said as matter of law that he must be held to knowledge of the presence of the pipe end on the step because it was so obvious and clear. Whether a thing is obvious must be judged by the circumstances surrounding the person at the time of the occurrence. Had this been the first time appellee had entered this pit, the probability is that he might or would have discovered the pipe out of place because he would have proceeded with that care and investigation which unfamiliar surroundings beget. But he was thoroughly familiar with the ladder and his surroundings; he had used the ladder safely many times; he had no knowledge of any condition requiring particular care, and there was nothing to put him upon special guard. While he had noticed that some of the pipes were loose a few days before, none of them at that time interfered in any wise with the steps. While it was not part of his knowledge at the time he went down, yet another witness testified that he was in the pit about half after one of the preceding afternoon and there were no pipes on the steps, though he noticed one pipe vibrating and loose on the end. The projection of the pipe on the step tread was apparently slight and such as not to attract particular attention. It was below him on a ladder fixed into a wall. When all of these circumstances are considered, there is no basis for imputing knowledge which can in turn be the basis of an assumed risk.

■ *As to His Actual Knowledge.*—Careful reading of the entire evidence makes clear that appellee did not know the pipe end was there until just as his weight came upon it—at that instant, and too late to save himself, he saw the pipe end.[2]

The judgment must be, and is, affirmed.

[2] Appellee's testimony as to when he became aware of the pipe on the step appears in several different places in his evidence, as follows:

"And I raised the lid up and throwed it back and started over in there as usual; looked down in there and started to climb over and climb over, and started down in there and just as usual, and I got on this pipe.

"There is a pipe that was on the top of the steps. Well, I said the pipe, or something. I say it was a pipe, because when I fell why I remember taking it

down with me, you know. It was going down with me.

"Where were your hands at the time that you fell? A. On the grabiron. They was on the grabiron.

"Q. Were you holding to the grabiron with your hands? A. Yes, sir.

"Q. Why didn't you hold with your hands? Why did you fall? A. Because I slipped out. I wasn't looking to fall. I slipped out and throwed me backwards.

"Q. When you go down the step-ladder you hold? A. Held on just like I always do.

**In re PICCADILLY REALTY CO.**

**SMITH et al. v. PICCADILLY REALTY CO.**

No. 5464.

Circuit Court of Appeals, Seventh Circuit.
June 21, 1935.

Rehearing Denied July 30, 1935.

"Q. Tell the jury. what you were doing at this time with your hands. A. I was holding the grabiron step.

"Q. You are a stout man? A. Yes, sir.

"Q. They sent you out on an exhibition as a stout man, yet you didn't hold to the steps? A. I didn't do it.

"By the Court: Don't argue with him.

"Q. Did you say that the pipe broke or uncoupled or what? A. I said it slipped off the step and throwed me backwards.

"Q. You said something about something uncoupling, didn't you; coming unscrewed or uncoupled? A. If I did I didn't know it.

"Q. Maybe that was your attorney said that in his opening statement. Did it uncouple? A. Which?

"Q. Did anything uncouple—come uncoupled? A. I don't know.

"Q. You don't know? A. No.

"Q. The step didn't come unscrewed? A. I couldn't say that, whether the step broke or what, because I didn't have time to look to see whether the step broke or what, but I know that the pipe went down as I went down. * * *

"Q. Did you see this pipe before you put your foot on it when you went down there? A. No, sir. * * *

"Q. Now, tell the jury again what caused you to fall? A. The pipe breaking and throwing me backwards what caused it.

"By the Court: Q. What was the answer? A. I say, a pipe slipping off the step, throwing me backwards is what caused it.

"Q. Did you see the pipe? A. Yes, sir. I saw the pipe.

"Q. Where was it? A. It was on the top of the step.

"Q. Just tell the jury in your own way how it occurred? A. Well, in going down steps or anything like that, like a ladder, it is natural that a man in making a step, glanced down that way, as I was going down this step. They are all the same distance apart. This step seemed to be a little closer than the others, and as my foot hit it it seemed like it hit it quick, you know, quicker than it should. I glanced down but I had done throwed my weight on this, you see. Just as I looked down why off it went.

"Q. Off what went? A. Off this pipe. The pipe went off the step, and I remember the pipe going down as I went down. When I hit the floor on my back and shoulders why it knocked me unconscious. * * * We have electric lights down in this pit and I had turned them on before I started down. I knew the pipes were there as I have been down there several times, but as I was going down I could not see that the pipe was extending out as it was. I was in the pit alone at the time of accident and no one else saw this accident. * * *

"By the Court: Let's see just a minute there. Does he say that he knew those pipes were on the step?

"By Mr. Moorehead: In this statement he does, yes, sir. And he says he knew those pipes were there for eight years.

"By the Court: That is a different proposition. Does he say in that statement that he knew that pipe was on that step?

"By Mr. Denman: No. No.

"By Mr. Moorehead: I will read it to you. 'We have electric lights down in this pit and I had turned them on before I started down. I knew the pipes were there as I have been down there several times, but as I was going down I could not see that the pipe was extending out as it was. I was in the pit alone at the time of the accident and no one else saw this accident.' Then he tells about the paint buckets, and then he says, 'I had reported the conditions of the pipe to Foreman Smith. It was not my duty to make repairs to the pipes as I am not a pipe fitter.' Now in his statement he says that he knew the pipe was there. That refers back above where he says that he knew the pipe was on the step.

"By the Court: No, I don't agree with you. However, that is a matter—I just

Charles Remster, H. H. Hornbrook, Albert P. Smith, Paul · Y. Davis, Kurt F. Pantzer, Ernest R. Baltzell, and William G. Sparks, all of Indianapolis, Ind., for appellee.

H. K. Bachelder, Wm. C. Bachelder, and Fred E. Barrett, all of Indianapolis, Ind., for appellants.

Before EVANS, FITZHENRY, and ALSCHULER, Circuit Judges.

didn't want you and the witness to misunderstand each other.

"A. I just made a statement to him and he wrote it. I didn't make that statement that that pipe was on the steps.

"Q. Then you deny that this statement is correct? A. Yes, sir. I deny that it is correct.

"Q. Now, you said in your testimony on direct examination awhile ago that you saw the pipe there as you were coming down? A. That is what I said.

"Q. How far was it out on that. step? Was it against the wall or in the middle or out at the edge? A. Out on the edge on top of it. About where the ball of your foot—

"Q. Out on the edge of the grabiron, was it? A. On the.edge of the grabiron.

"Q. And it was on the edge of the grabiron here just like that and just slipped off, like that, did it? (indicated) A. Yes, sir. * * *

"Q. When you saw that pipe there on the edge of the step you could see it was in a dangerous position,.couldn't you? A. I done throwed my weight when I hit that pipe, I told you, I had done· throwed my weight and the distance between the two pipes made me give it that (indicated). I had done throwed my weight. But I was too late. I had done gone over. The twinkle of an eye you know is pretty quick."